We have a number of cases scheduled for argument this morning. Before I begin, two matters. First, I would like to recognize the presence of a number of patent judges from South Korea. We are honored to have them here in the audience, and we welcome them to the Federal Circuit. Second, I would like to make a motion for the admission of a candidate. And for that reason, I will turn over the presiding responsibilities to my colleague, Judge Moore. Thank you. Please proceed. Thank you. It is my pleasure to move for the admission of Philip Warwick. Mr. Warwick has served with distinction as my law clerk for the past 18 months. He's done a superb job. He's made a significant contribution to the work of my chambers and to the work of this court, and I'm grateful for that. I'm very proud of what he has accomplished. And for that reason, I'm happy to move the admission of Philip Warwick, who is a member of the Bar and Good Standing of the highest court of New York. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. Any objection, Judge Klaffinger? I'm delighted to approve the motion, and I hope we see you back many times in the future, not in our chambers necessarily, but sitting at one of these desks right down in front of us. Well, I'm excited to approve your motion, Judge Lynn. This is my first time presiding, so I will remember you forever, Philip. I'm quite excited. So if you now turn to the clerk of the court, he'll administer the oath of office. To the judge's right hand, we swear or affirm that you will report yourself as an attorney and consulate to the court, uprightly and justly, and follow in the support of the Constitution of the United States of America. I do. Congratulations, and welcome to the Bar, and I ask that you show your appeals to the clerk's court. Welcome. All right. Well, for those who are standing, if they are members of the Bar, there are seats available up front. If you're not, I suppose you'll just have to wait. All right. We'll proceed with our first case, and for just as a notice to all of the counsel who will be arguing today, for the benefit of the court, for those who later may be listening to the audio recordings, I would appreciate it if, when you approach the lectern, that you enter your appearance, just clearly state your name and who you represent, and that way everyone will be clear. And the first case we will hear is Appeal Number 2007-1565, Net Money In versus Verisign. Good morning, Your Honors. Good morning. Please, the court, my name is Bill Birdwell. I represent the plaintiff, Net Money In, Inc., and I'd like to introduce my colleague, Mr. Tim Volpert, who's assisted on this matter. I have put up here a chart, which is a copy of some illustrations in our opening brief, and I have also given to the courtroom deputy copies, paper copies of it, if you want. She wanted me to let you know that. The first issue I would like to address is the issue of non-anticipation of Claim 23 of the 737 patent. And to discuss that issue, I think it is helpful to look at what's shown by this chart, because the only reference, of course, for a, the IKP reference was, of course, the only reference for anticipation. And what the IKP reference really shows is a system of encryption protocols, which were applied to two existing physical arrangements of- where it talks about the protocol without browsing, and it goes into the variations. Is that correct? Is that really where you're- That's correct. Okay. That's the document that starts at 1374. Sure. But the key pages that you're focusing on, which is something akin to what you're representing here in this exhibit- Yes. Is what we're looking at on 1394. And namely, I understand that your argument is example one is a seller-only communication model, and example two is a buyer-only communication model. That's right. Is that a fair assessment? That's correct. And I understand and appreciate the Glaxo problems with the district court's opinion, but here's another concern I have, which is this is certainly not all that exists in this document itself. And as I read this document, which I did many times to try to get myself to understand what was going on, I read it, and throughout the entire beginnings of the document, there are several photos, and they're talking about a protocol, and it seems to me they're talking about always, in the initial portion of the document, the seller-only communication protocol. Would you agree with me? Yes, that's correct. Okay. Because I look on, for example, page 1376, and I can see there the diagram clearly shows what appears to be a seller-only model. Yes. And you turn, and you can look on page 1381, again, the seller-only model, and up through this entire portion, they're really talking about a model where the seller is communicating directly with the acquirer. That's correct. Okay. Now, here's what caused me a little bit of pause, because on 1383, we're still in the same protocol. If you could turn to 1383 with me, the notes at the bottom of the page, there are two notes that are particularly concerning to me. Now, I realize these are not the basis upon which the district court decided his case, so I want to make sure you have a chance to read them with me. Pardon me, Your Honor. Yes. Do you mean, is that page 10 of 24 up in the upper right-hand corner on the document? Yes, sir, it is. Okay. Thank you very much. And it says on those notes, even though this is a seller-only communication model generally, it says proof of buyer authorization is always indirect, i.e., seller takes acquirer's yes or no, to mean that buyer authorization was verified. Well, that pretty strongly implies that the buyer communicated its authorization to the acquirer, who then told the seller yes or no. So that would actually, to me, indicate a buyer, even though the seller is generally the only one communicating with the acquirer, in this one instance, i.e., the authorization is always indirect, meaning the seller is not the one giving it to the acquirer, it's the buyer. You go to the next little asterisk, and it says anonymity is meaningless if option one is used, unless buyer communicates directly to acquirer. So why, given that this throughout the first portion is the seller-only model, why don't these two asterisks indicate that while the seller is the one who is generally communicating almost everything, they're not actually communicating everything. The authorization is coming from the buyer himself directly to the acquirer. So I guess, why doesn't this disclose what it is you claim? I'm sorry it took me so long to get there. No, no, that's okay. The question, as far as I know, has never addressed either trial, so you're hitting me cold with it. I assumed that. I mean, your position depends on being able to sustain your argument that model one and model two are mutually separate from one another, and that in model one, the seller model of the buyer never communicates with the acquirer. Right? That's correct. Your case hinges on that, and yet the reference itself says, with respect to model one, that the buyer can communicate directly with the acquirer. I don't see that that reference says that. All it says is that proof of buyer's authorization is always indirect. Unless the buyer communicates directly with acquirer. What about that second one that says anonymity is meaningless unless the buyer communicates directly to the acquirer? I mean, doesn't that disclose to you the buyer communicating something to the acquirer himself as opposed to through the seller? You know, I can't tell you. You know what the note's all about. It's about your levels of security. That's right. Right. And if you use option one, then there's no anonymity, right? And it says, well, in this model, if you want anonymity, then you have the buyer communicate directly with the acquirer, because that way he's not leaving a signature, right, in option one. I don't read that as saying that, and our expert did not read that as saying that. How do you read it? How do you read it? You understand what OPT1 is, don't you? Option one, yes. And, you know, option one comes, if you look back at your flow chart on 1381, it's in payment. That's where option one, the signature, would come in. And so it says, well, whoops, whoops, if anonymity is something you're concerned about, and this whole protocol is about levels of encryption to either achieve or not achieve anonymity, it says if you're using option one and you want anonymity, then you better have the buyer communicate directly with the acquirer. I realize this wasn't raised, but we do review judgments, and the district court, even if his or her reasoning is flawed, if nonetheless the judgment is correct because this document does, in fact, disclose a system wherein both the buyer and seller communicate to the acquirer, then it's not as you've held it out to be, and we can affirm his judgment. I understand that you are reviewing this de novo and you're reviewing a judgment. What I would say to that is I can't be certain what those mean without studying those particular notes, which I will acknowledge I have not done because the issue never came up at any time during the course of this case until this moment. Right. But we did have expert testimony from Mr. Lenzer who analyzed this document thoroughly and indicated that these were the only two combinations of links between various entities. Right, but there's expert testimony on the other side of the fence saying that basically what the IKP is is an architecture disclosure that discloses a vast architecture that tells you how you can or cannot achieve anonymity in these four-party transactions. And at most that gives rise to a genuine issue of material fact that should be sent back for trial if that's the case. Because we have two credible experts saying opposing things. But your expert doesn't address this. He focuses on 1393 and 1394, which you know what, I agree with you on. If that were the only part of this document, I think you'd have me. But when you read the entire document, which is part of the record and which everyone did, I just struggle with how you can overlook these earlier notes. In Model 2, for example, why is it necessarily so that the seller is prohibited from communicating with the acquirer? Because it explicitly says so. No, it says this variation is useful where the seller has no direct communication or where the seller simply doesn't want the burden of communicating. Doesn't that say that? That's right, where there's no communication between the seller and the acquirer. Now, I don't see how you can read that any other way. I mean, you might say, well, it would be possible to do it, but that's not what this document discloses. The fact is if you look through this document, there is no explicit disclosure or even implied disclosure of a communication between the customer and the acquirer under the same arrangement of links when there is also a communication between the merchant. Well, if you're reading the first paragraph under 12.2, this variation is useful as, in essence, a disclaimer, saying that the seller is never going to communicate. If that's true, that in the IPAT, that's what the purpose of that paragraph is for, wouldn't you have expected to find the same paragraph on 11.2 where it's talking about Model 1? I'm sorry, 11.2. Section 11.2, yes. If you look at the two models, they're at 1392 and 1394. Right, right. And so if you're reading that first paragraph under 12.2 as this disclaimer, they're saying, boy, we want to make certain that everybody knows that in this model, the seller will never, ever, ever communicate with the acquirer, and that's the purpose of that paragraph, and then you'd expect to see the same paragraph in 11.2 saying the same thing with respect to the other party. But I think all of this… It's not there. Pardon? But it's not there. Well, I don't know why you would expect that there. I think the majority of this is as… I mean, if the intent of the drafters of this architecture reference was to make certain that these are two models that are never mixed, that there's a Chinese wall between them, and they have a special paragraph designed for erecting the Chinese wall, in one case you would expect the drafter to have done it in the second instance. No, I don't think so at all. I don't think that was the intent of the drafters. I think you have to take it in the context of what existed in 1995. In 1995, these were the two types of systems that were available out there as the prior art, where you have the merchant talking with the acquirer, and this was the predominant system, where the customer would send its account number to the merchant after determining what it wants to buy. The merchant would send it to the acquirer, and the acquirer would go to the issuer and back that direction. That was predominant, and it's like a point-of-sale transaction. The other model that was available, but not widely used, was where the customer would talk to the acquirer. And, counsel, with regard to 1393 and 1394, I expect that you would say, well, look, this is summary judgment, and all factual inferences had to go in our favor, and you did have an expert that clearly indicated that these two represented two discrete and different protocols, and that even if Judge Clevenger or others thought that 12.2 doesn't necessarily prohibit, this is summary judgment, right? Yes, and I wish I had said that. Thank you very much. But let's go back to my notes, because I still don't feel happy about being able to say that these notes don't disclose exactly what you say the whole document doesn't disclose, which is namely a system wherein you have both seller and buyer communicating with. So if you can give me some reason, some factual reason that would prohibit me from, on appeal, saying I should affirm a summary judgment grant, I'm really eager to hear it. Well, I was about to finish my point, and maybe this will help, which is that these were existing types of physical systems. These were the connections that were available. These were the communications that were available. What the IKP did was say, okay, we want to make this more secure. Let's provide a family of protocols that can be applied to these communications. Now how, in this situation, there would be any proof of buyer authorization being indirect, that is the seller takes, acquires, yes, no, to mean buyer authorization is verified. I don't know, except that obviously the issuer is the customer's issuing bank. That's the one who issued the credit card. So there could be arrangements between the customer and the issuer, whereby when the issuer issues an authorization, that's an indirect verification that was indeed authorized by the buyer. Is there any testimony from experts on either side with respect to the notes we've been discussing at the bottom of page 13? There was none. This is a totally new issue. We were well into your rebuttal, and I assume you'd like to reserve some time. Yes, I sure would. We have consumed a good bit of it, so we'll reserve four minutes. May I take one more minute? It's your time. Thank you very much. Because we haven't talked at all about the structure supporting the function in the Claim 1, 737. 727? Claim 1 and 2 patents. 737. Pardon? It's Claim 1 of the 917 and Claim 1 of the 737. But I'm focusing on Claim 1 of the 737 patent. 737. 737 patent, Claim 1. 737. That's the one that has bank computer means for generating authorization in response to receipt of an account and amount. If I make no other point, I want to make this point, which is that whether there is structure there needs to be evaluated in the eyes of a person of ordinary skill and the art. And there is unrebutted testimony by our expert, Mr. Lunzer, that the bank computer as described in this patent would be readily recognized by a person of ordinary skill and the art as a widely used and understood entity. Moreover, at the beginning of that claim, it doesn't just say bank computer. It says bank computer containing financial data including, I may not have this quote exactly right, but including customer account numbers and available credit data. There's no structure and no algorithm disclosed. But there is structure and it's because of this. Do you think it's the bank computer itself? I think it's the bank. Even though the bank computer is not in the means limitation? Yes. But if you drafted a patent application that involved using an ATM, would you have to say? We ordinarily look in the means limitation itself. I don't think that's true. There's no decision of this court that said you have to do that. There are several decisions, including a recent decision. A recent decision, I believe it's Trice. I'm sorry. It was just cited. Oh, here it is. If we disagreed with you that the first bank computer itself is the structure that makes up, it is structure that defines the means limitation, if we disagreed with you on that, then where in the specification do we find structure that is clearly linked to the means limitation? Very well, the specification. Can you point in? I'm looking at page A48. Here's my response. The specification describes a. We need a line, a column and a line. There is nothing in the specification which expressly states what goes on. Excuse me. There's nothing in the written description which expressly states what goes on inside that bank computer. But there is at the beginning of the claim where it says bank computer includes these data structures. Now, the other side has said the data is in the structure, but that's not true. Because to put data into a computer, you have to modify the logical makeup of that computer. I think your answer to my question is that there is no specific linked disclosure in the spec. You just need to have the answer to that question, because if I disagree with you that the first bank computer itself is structure that defines the mean limitation, then you've got to point to something in the spec. That's the law. Well, I think my response to that, the law is that it's the spec, and the spec includes the original claims as filed. And the original claims as filed included claim one. It included that structure, that data structure. So that is structure. It has to be clear linkage. Well, it couldn't be more clear linkage. It's right there by the claim. And there are numerous places. No, I mean the linkage is what the law requires is there's something in the specification. It does include the original claims. It says when we talk about means for generating, what we meant as the structure for that is X. Okay. That's clear linkage. So in the patent specification, then column five lines 28 through 34, column six lines. That just parallels or mirrors the language in the claim as to the function. But the point I'm making is it describes the context in which that bank computer operates. And if you take the description, the structural description at the beginning of the claim, which tells you what the amount that it stores the account numbers and the credit. It's customer account numbers and credit data. Customer account numbers and credit data. That, in fact, modifies that machine. So it's a new machine. That is structure. And that taken together with the way it's used in the context where you send an amount, an account, it is perfectly clear to a person of ordinary skill in the art what goes on. They look up the account, check to see if they have the credit to make that charge and say yes or no. It's the same thing a teller would do. The same thing happens with an ATM. All right. I think we have your point. And you've used up pretty much all of your time. And I will give you two minutes for rebuttal. Thank you very much. Mr. Jakes. And to even the clock, we'll add three minutes to your time. Good morning. My name is Mike Jakes. I represent the Appellee Verisign in this case. May it please the Court. Was there any evidence or argument regarding the notes that, yeah, no, not so much? Your Honor, I don't believe so. But it does raise a very important point. And that's the appellant's argument that these two embodiments are mutually exclusive and that there is some wall between them and they can't mix. I think that footnote, if nothing else, shows that that's false, that there can be links between the buyer and the payment processing computer in the first embodiment as they refer to it. But there are other indications. You can't sustain the anticipation judgment here, right, unless you can convince us that the two models are not mutually exclusive, that is to say they can be mixed. Because you can't find the five links either in model one, all five, or in model two. You've got a mixed model, one in model two, and then you've got the five links. I would agree to a point, Your Honor. What's your strongest argument that these two models are not mutually exclusive? First of all, I would say they're not two models. You have to read this document as a protocol. And although there are two particular configurations that are described, we're not talking about two separate models. We're talking about a protocol. And if you start from the beginning of this specification, of this particular specification, this document, it does say this specifies a base protocol with a number of options. So we're not talking necessarily about two models that can't be mixed. If you also look under section 11.2, where it discusses this authorization and clearance step, it says clearance involves an additional exchange of messages. It's an extension. And on the next page, 1393, these changes involve very minor extensions to the basic IKP protocol. So what we're talking about are variations to the protocol, not separate. When the abstract and other places talk about a protocol, the number of options, the word option is used very concretely in here. It specifies the options which designate the amount of security that's being afforded. That word isn't interchangeable with the different protocol variations, which are called such on 1393 and 1394. Your Honor, I think it does, though, explain what the intent of this document was, was to provide different options for security and for configurations. No, it sounds an awful lot like a question of fact. What was the intent of this document? And this was summary judgment. And disputed issues of fact have got to go in their favor. And they had an expert that testified about his belief about all this. And that makes up holding summary judgment really hard. Your Honor, I would say there that there is a dispute, but I don't believe it's a genuine dispute. I think the document, as they say in their reply brief, the document speaks for itself. And simply because they have an expert who repeats their arguments as to what the document discloses. Judge, did the district court directly confront the question of whether these two models we're calling them are mutually exclusive? I don't believe you'll find that in the court's opinion. Although he did find that the fifth link was disclosed. And so I think that's implicit in what the court found. Was the issue brief? On whether or not they were mutually exclusive. I believe that the plaintiff did raise that argument, yes. But the point is, there's nothing in this document that says that they are mutually exclusive. So simply having an expert say that. What I'm a little concerned about is that if it seems to me, and please correct me if I'm wrong, that in terms of the anticipation judgment, we have found what may or may not be the Achilles heel. Because I think that you, in essence, candidly admitted to me that if the two models can't be mixed, if you will, then there can't be anticipation. And we have now identified at least one perhaps important data point in those two notes to model one that perhaps suggests that model one is not itself a monolithic, mutually exclusive Chinese walled model. And we have experts that may not have actually focused carefully on this very question. Wouldn't that suggest to you that the court would not be, I don't know, beyond its senses by saying that the summary judgment here was inappropriate and there ought to be a trial? Your Honor, I think if it's plain on the face of the document, that sending the case back to have a trial would be not necessary. Well, help me then again, please, now we're going to talk about what's plain on the face of the document. No reasonable juror could possibly disagree with you. That's what you're telling me. That's right. Let's, the same way that I was a bit specific with your colleague, your adversary, let's get specific about the IP case. Show us where it is so clear. I don't think there's any dispute that the first four links are disclosed in section 12.2. That's on page 1394.  That's one link short of 102. Yes. So we start there and then on page 1392, where it discusses clearance and the additional, an additional exchange of messages between the seller and acquirer, that's right above the figure, that is where the fifth link is found. And as that section says, these changes involve very minor extensions to the basic IKP protocol. I'm sorry, I've lost you. Which page are we on on that? On page 1392. Middle of the page? Yes. There's a paragraph that starts the distinction between? If you actually look to the following paragraph. Protocol outline supports authorization, extending it to cover clearance? Yes. It says the protocol outlined in this document, not the first protocol, not the protocol at the beginning of the document. It says the document supports authorization. Extending it to cover clearance involves an additional exchange of messages between the seller and acquirer. And there is the fifth link. That's in Model 1. Well, I don't think it says it's in Model 1. It says the protocol outlined in this document. Well, I know, but if you look at 11.2 on 1392, which I always thought was Model 1, it's buyer, seller, acquirer. That's the way the blocks are lined up? Yes. And then you look at 12.2, it's acquirer, buyer, seller. So that's Model 2. This is only providing one additional link between the acquirer and the seller. Right, but you started off by saying in the 12.2, which I take it to be Model 2, you found four links. Yes. And then you said, well, we're going to find the fifth link. Well, if you find the fifth link in 11.2, which is Model 1, that doesn't help you. I think it's incorrect to read that as saying it's just Model 1. But it's in a section, 11.2. These people drafted this thing for some reason, right? Leading all the way up to until we get to 12.2, putting aside the two notes I pointed to, I mean, wouldn't you agree with me that every discussion and every picture shows the little arrows between seller and acquirer, but no similar arrows between buyer and acquirer anywhere in any of that that led up to it? I don't think you'll find those arrows. I think if you go back to your footnote, though, it does suggest that that communication between the buyer and the acquirer can take place, though. That's in Model 1. Well, isn't that incorporating what you call Model 1? That discussion of Model 1 throughout and up to page 1392 refers to the protocol, namely Model 1. The protocol, protocol, protocol. Then we start in section 12, protocol variations. Yes. Which suggests that we're talking about something else. And I think that that's the essence of this document. There are variations. When I pressed you, Mr. Jakes, what I was trying to do was to see the same way I pressed the other side on the 112.6 issue in the specification. This is, you know, specific stuff we do up here. So I was saying you're contending that the IPK reference itself, that no reasonable juror could disagree with your position. Now, up until now in the discussion that you've been having with the bench, I think you're losing that argument because there seems to be a considerable amount of doubt as to whether or not you're really right. Can you point to anything else other than that language you pointed to in 11.2 about extending the cover clearance? Is there anything else you can point to that shows that no reasonable juror could disagree with you? I would point to on the next page, on 1393, toward the end of that section, the last sentence that says, these changes involve very minor extensions. This is 1393? 1393. Right before you get to 11.3, the last sentence, we're talking about clearance. These changes involve very minor extensions to the basic IKP protocol. What is the basic IPK protocol? That would be good for us to know, wouldn't it? It would, and I think it's what's described in the totality of the document. Why is it not what's described up to that point? Because the rest of the document talks about a different protocol, protocol variations. I think it reads the document too narrowly to just say that this can only apply to a particular configuration. If you think about it, if you look at the protocol that's in 12.2, the seller has to get paid. There has to be clearance. Well, Mr. Jay, this is something that troubled me all yesterday afternoon when I was arguing with my law clerk about this. We are not interpreting a claim here. We're interpreting a reference, a prior reference. So we can't sort of roll up our sleeves and use our Markman muscles here. We don't have independent review of what this document means. Now, what standard of review are we applying here? The trial judge apparently didn't really give us an opinion in which the trial judge grappled with the precise meaning of this document as understood through the lenses of the experts and the lawyers, right? I don't think it was necessary. I think it's plain on the document's face, and he did what was necessary to enter summary judgment. I think it's very plain that there is this fifth link and that only it's... I don't hear the other side to disagree that if they lose their Chinese wall argument, then the game's over. Because I didn't... Maybe they'll on rebuttal choose to say that. I'll open it for them. But my understanding was that the five links are disclosed inside of the ITP. And I don't think there's anything in this document that supports the fact that these are mutually exclusive. You can't find that. They use the words distinct, separate, mutually exclusive. You won't find those in the document. That's just the expert creating a dispute really where none does exist, and I don't think that creates a factual issue. But is the question whether they are mutually exclusive or whether they are disclosed as being together in a system? I think that those may be two sides of the same coin, but I think there are enough suggestions in here that they are not mutually exclusive, that that means that they can be used together. Counsel, suppose that they were mutually exclusive. Suppose that a document says, example one, and example two, not to be confused with example one, and it goes through a second example. And it's absolutely crystal clear, no one could disagree, that example one is seller only, example two is buyer only. They say, you know, in the buyer only, it says, seller will never under any circumstances... You see where I'm going? Yes. Okay. So you're not arguing to us that if that were the situation, that one could find anticipation simply because all five elements appeared within the confines of a single document, right? I wouldn't argue that. And if I interpreted the district court's opinion, and especially his reference to Glaxo as seeming to do that, you would agree that would be erroneous. You're probably going to tell me I shouldn't interpret it that way, but if I interpreted that that's what he did, you'd tell me that would be erroneous. If that's what he did, I wouldn't agree with it. But as you say, I don't believe that's what the court did. I think what the cases do say is that you can't simply use the claim as a parts list. You can't go pick and choose parts. The interrelationships are important, and I think that's what the recent Finisar case says. When it talks about it has to be arranged as in the claim, it means you can't ignore any of the limitations that interconnect the elements. I don't really think that's our situation here. I think if you look at the document... That's right. If you look at the document as a whole, there's nothing that separates these two embodiments. There aren't really two embodiments. It's a protocol with variations, and when you apply the variations as described... I think your strongest argument in a way would be on page 1378 where they define IKP as an architecture, a general architecture that accommodates a variety of payment methods, interactions. That's right. Any particular use is going to require a detailed specification for that particular use suggests that you could pick and choose. That's where I would start and where I did start. It does describe options that can be used with the basic IKP protocol. Would the court like me to say anything about the 112 paragraph 6 issue? I'd be glad to address that as well. That's up to you. I just have a couple of things to say. The first would be I think that the court's recent aristocrat case is very relevant to this issue. It very plainly talks about whether or not a computer being disclosed in the specification is adequate structure. There should have been an algorithm. Is that what you're going to... What's that? You believe there should have been an algorithm. There should have been something more. I won't say what the disclosure had to be, but simply saying a bank computer can't be enough. Give your adversary a view. He's not saying it's just a bank computer. It's a bank computer that's got some data in it. It's got the customer's credit card information in it and everything you need to know in order to generate the authorization. We have to look at the function. The function is a means for generating this authorization indicia. It's a means for generating an authorization indicia in response to queries that contain their customer account number and amount. The bank computer has got in it the customer account numbers and available credit data. It does. When you hit the bank computer, it says, Mike Jiggs wants to spend $19.82 at Smith and Hawkins. The question is, does he have a valid credit card and does he have enough money in the bank to do that? There's no structure that's disclosed for how to generate that indicia and how that function is performed within the computer. There are thousands of potential computers that could be used here. If you look at the expert's declaration closely, he doesn't say what the structure is. I suppose your argument that I didn't see you really making is that the reason why that there has to be an algorithm or something like that that's disclosed is because the beauty of 112.6 is that you not only get the structure, but you get the equivalence. But see, he's alighting that argument. Your adversary is alighting that argument by saying, this is not a 112.6 claim. He's not asking for equivalence. He's simply asking for a bank computer that's got customer account numbers and available credit data in it. To reach that, though, you first have to overcome the presumption that the means isn't what it says, that the word means isn't used. True enough, but I think the reason why your adversary is part of his argument on this particular limitation and this particular patent is that it discloses enough structure so that the presumption that it's a 112.6 claim is overcome because he knows he's got a problem with a weak spot in his spec. Why isn't it reasonable? Doesn't anybody know that if you've got a bank computer that's got financial data, including customer account numbers and available credit data, it's going to have no trouble at all spitting out the authorization? Just because one skilled in the art would know what that function is, that doesn't adequately describe the structure. I think it's really the same question, whether it's the word bank computer in the claim itself or a bank computer in the specification, that is not enough structure to tell you how that function is performed. We have to look at that function of generating the indicia. Are you saying that there's nothing to suggest or indicate the particular basis on which this authorization indicia is generated? There could be many different ways that it's generated. No structure, there's no formula, there's no analysis, there's nothing to indicate what factors are taken into account in determining yea or nay whether an authorization code is generated. That's right. Is that what you're saying? If you look at the way it's described and the way the expert describes it, they describe it from a very external viewpoint. They give the customer's account number, the amount, and they get something back. But they put this in the claim. They put a means for generating in the claim, and we have to know what the scope of that is, and that's why 112 paragraph 6 comes into play. We could probably generate a lot of different types of authorizations. One of them says, thanks for banking with us. One of them has a little smile face on it or something like that, and all of that will erupt from the algorithm, right? From the algorithm, the computer itself. These can be massive financial networks. In fact, it's not even really clear when you contact Visa whether you're going to contact the card issuing bank or how the authorization is going to take place. Well, the authorization has just expired, so your time is up. We thank you very much for your argument. We'll now hear from Mr. Birdwell. Any rebuttal? Yes, Your Honor. I have several points to make. First of all, I want to state emphatically that there is a dispute as to whether those four links exist. There's only one link that we agree exists, and that's between the customer and the merchant in getting its promotional information. We have argued that in the briefs. Our expert testimonies testified that the other four links are missing because there's no payment processing computer. No matter how many times the other side says that there's no dispute about those four links, we don't agree with that. And that's in the record. I don't want to spend a whole lot of time on it, but they keep saying that it's wrong. Secondly, I have an explanation for you regarding those notes. As I read that, what they're saying, they're talking at page 1383, I believe. That's what I have in my copy here. But it's the notes that Judge Moore pointed to begin with. Yes, 1383. They're talking about option one, and as I read that, what they're saying is that option one isn't a very good option because it has certain limitations on it, because the only way that you know that the buyer's authorization is verified is indirectly because the issuer tells you it's verified, and that's because the buyer or the customer has a contractual relationship. Option one has the buyer's signature in it, and that's what breaches the security wall. So that would come from, I presume, from the issuer. From the issuer, so that's... And the other thing... No, the buyer, if you look at the charts there on page 1381, basically if you went to 1383 and you went up from the footnote to the top of the page, you'd see OPT OPT1. OPT1 puts the buyer's signature, SIGB, in the payment line. So then you go back to 1381, go to the top of the page where you've got the box, buyer, seller, acquire, and you look at the payment line, and the payment is information coming from the buyer right to the seller. Yes. And that's where option one, your signature is. And they say, woo, don't do that. If you want to have security, don't do that. Very well. You're in trouble. So they say if the buyer communicates directly to the acquirer, you jump past the seller, you could send OPT1 if you wanted to to the acquirer because you're not going to have a breach of your security. But it doesn't say that is done, and that's the point. It doesn't say that the buyer does communicate directly with the acquirer. And, again, these are just cautionary notes about the limitations of options. The note with the first asterisk, by the way, that I pointed you to the first time, that has nothing to do with option one because if you look at the table above it, it hooks up with S2, security level two, where under necessary options it says zero. So that has nothing to do with option one. When you are choosing no options to add on to the basic protocol, nonetheless, that note seems to indicate that the buyer would communicate their authorization directly to the acquirer, and the seller takes the acquirer's yes-no on it to know whether it was communicated. No, I don't think that says that the buyer is communicating with the acquirer. I think it's just a cautionary note as to the limitation of these options. But I think the real point here is everybody... No, no, no, wait, but that asterisk applies when you know there are no options. Look at the table above. Necessary options, zero, and that's where asterisk one appears. And your final comment. Okay. Well, my final... You can answer Judge Moore's question. I don't know if there's a question. I'm having to read this on the fly right now. That's the best I can do. I think my comment on it is that this is clearly a very complicated document. There were disputes over what it means. Even this court is trying to figure out what it means. I don't see how it could possibly be anticipation which requires identity and where the inferences are in favor of our party and there are genuine issues of material fact. Thank you very much. Thank both counsel. The case is submitted.